UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN JUDE SEKO,                                )
                                               )
Plaintiff,                                     )
                                               )
v.                                             )
                                               )       Case No. 4:15-CV-1669-RWS-SPM
                                               )
                                               )
CAROLYN W. COLVIN,                             )
Acting Commissioner of Social Security,        )
                                               )
Defendant.                                     )


## REPORT AND RECOMMENDATION

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the

application of Plaintiff John Jude Seko ("Plaintiff") for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (the "Act"). This matter was

referred to the undersigned United States Magistrate Judge for a Report and Recommendation

pursuant to 28 U.S.C. § 636(b)(1). Because I find the decision denying benefits was supported by

substantial evidence, I recommend that the Commissioner's denial of Plaintiff's application be

affirmed.

I.    **FACTUAL BACKGROUND**

      A.  **Plaintiff's Testimony**

Plaintiff testified at a hearing before the Administrative Law Judge ("ALJ") on March 19,

2014. At the time, he was fifty-five years old and had an eleventh grade education. (Tr. 30). He

worked at Chrysler for about thirty years until he retired in 2007 with an early retirement

incentive. (Tr. 31). His job involved walking about six or seven hours in an eight-hour shift, turning and reaching, and lifting and carrying up to fifty pounds. (Tr. 34-36). In 2005, Plaintiff was placed in a lighter duty job due to problems with his neck and shoulders. (Tr. 31-32, 34). He had problems doing even that job, because the turning caused a lot of pain in his neck and because a pushing motion he had to do caused pain in his shoulders. (Tr. 39-40). In 2007, the one job he could still do was going to be eliminated, so he retired. (Tr. 41).

Plaintiff has lower back issues that started in 2005. (Tr. 42). His back pain has been increasing and radiates down both his legs. (Tr. 44). Since 2008, Plaintiff has also had neck and shoulder pain that makes it difficult to sleep. (Tr. 43). He has been on pain medication for more than ten years. (Tr. 43). With medication and without putting stress on his body, his pain ranges from a three to a six on a scale of one to ten. (Tr. 44). Plaintiff can sit for about ten or fifteen minutes before he has to shift positions. (Tr. 45). He can stand for ten or fifteen minutes before he has to go lie down because of the pain. (Tr. 46). Plaintiff can lift about five to seven pounds. (Tr. 46).

In 2008, Plaintiff was hospitalized after a psychotic episode. (Tr. 32, 49-50). When he was working, he frequently had to take off work because of his depression and anxiety disorder. (Tr. 48). Plaintiff sees a counselor and psychiatrist and takes medications for depression. (Tr. 33, 47-48).

**B. Plaintiff's Medical Records**

*1. Records Related to Physical Impairments*

On July 6, 2005, Plaintiff had a cervical MRI due to a history of neck pain. It showed spondylosis with spurring and soft protrusions bilaterally, as well as right foraminal stenosis at C6-7 and displacement of the cord. (Tr. 225).

Records from Dr. John DuBois dated between December 2008 and September 2010 indicate that Plaintiff was being seen every two to three months, had diagnoses including cervical spondylosis, and was being prescribed medications including Vicoprofen; the notes contain little other information. (Tr. 287-95). On November 2, 2010, Plaintiff stated that his pain was controlled and he was not having any radicular pain. (Tr. 272). He was taking five Vicoprofen per day and had no side effects. (Tr. 272). His upper muscle strength was five out of five and his C-spine was non-tender. (Tr. 272). On April 27, 2011, Plaintiff reported that his neck pain was unchanged, with no radicular symptoms, and was controlled with his current medications. (Tr. 262). His extremities appeared normal, with no edema or cyanosis. (Tr. 263). On July 11, 2011, Plaintiff again reported that his neck pain was unchanged and was controlled with Vicoprofen. (Tr. 269). His upper extremity strength was normal, with no edema or cyanosis. (Tr. 270). On October 27, 2011, Plaintiff reported that his neck pain was stable and that he had no upper extremity weakness. (Tr. 252). On January 28, 2012, Plaintiff reported that his back pain had been getting progressively worse for six months, but that he had no radicular pain. (Tr. 259). His upper extremity strength was normal. (Tr. 260). On April 18, 2012, Plaintiff reported that his neck pain was controlled with medication and that he had no weakness. (Tr. 243). His extremities appeared normal, with no edema or cyanosis. (Tr. 244). On July 16, 2012, Plaintiff reported to Dr. DuBois that his neck pain was controlled with medication. (Tr. 302). His upper extremity strength was normal. (Tr. 303).

On August 29, 2012, Plaintiff saw Dr. Yasuo Ishida for a disability examination. (Tr. 306). He reported back pain in the neck and torso. (Tr. 306). It was noted that he was able to perform all activities of daily living, that he had limited his grass cutting to using a riding mower, and that he was able to climb a flight of stairs. (Tr. 306). He reported being unable to

sleep for more than four hours at a time. (Tr. 306). Dr. Ishida noted some tenderness to palpation in one knee joint and noted that Plaintiff had trouble getting in and out of a chair, transferring to the exam table, and crossing his legs. (Tr. 307). The cervical spine range of motion showed evidence of impairment, with lateral flexion 35/45 bilaterally, rotation 45/80 bilaterally, flexion 40/50, and extension 30/60. Lumbar spine examination showed minor deficits of 70/90 in flexion and 20/25 bilaterally in lateral flexion. (Tr. 307). Seated and supine straight leg produced pain at 70 degrees. His hip range of motion was symmetrical at 75 degrees/100 bilaterally, and his knee extension was 120 degrees/150 degrees in both knees. (Tr. 307). Dr. Ishida diagnosed cervicalgia, pain in joint involving lower leg, and obesity. (Tr. 307). He found that Plaintiff had a 50% range of motion deficit of the cervical spine in flexion and extension, as well as rotation, with no neurologic deficits. (Tr. 308). He stated, "Physically this claimant has little in the way of functional limitations in his activities of daily living." (Tr. 308).

On January 29, 2013, a lumbar spine X-ray performed due to low back pain showed Grade 1 anterolisthesis of L4 on L5 likely degenerative in etiology; moderate diffuse degenerative disc disease, and mild reverse S-shaped thoracolumbar scoliosis. (Tr. 367).

On February 4, 2013, findings from a lumbar spine MRI included mild lumbar spondylosis, mild to moderate facet arthropathy; multilevel foraminal stenosis and a right L4 nerve root compromised in the foramen; spinal lipomatosis and multilevel central canal stenosis ranging from minimal to marked; and L4-5 left facet effusions compressing the left descending L5 nerve root, which may be a source for pain/radiculopathy. (Tr. 365).

On September 18, 2013, a lumbar MRI showed transitional segment at the lumbosacral junction with partial sacralization of L5 and multilevel degenerative change, most significant at

L4-L5, with advanced facet arthropathy at this level with fluid in the facet joints and a left-sided synovial cyst that abuts and displaces the exiting left L4 nerve root. (Tr. 359).

On September 10, 2013, a lumbar spine MRI showed transitional lumbar vertebral body with sacralization of the fifth lumbar vertebral body and mild degenerative changes elsewhere in the lumbar spine. (Tr. 361).

On November 12, 2013, Dr. DuBois completed an opinion form for Plaintiff. He stated that Plaintiff had lumbar spinal stenosis due to degenerative disc disease and spondylolisthesis; cervical spinal stenosis; hypertension; hypertriglyceridemia, gout; and allergic rhinitis. (Tr. 354). He noted that Plaintiff had pain at a five to ten out of ten in the neck and lumbar area, with the pain radiating to his legs and right arm. (Tr. 354). He noted that Plaintiffs' diagnoses were supported by an MRI of the lumbar spine dated September 18, 2013, a lumbar spine X-ray, and an MRI of the cervical spine dated July 6, 2005. (Tr. 354). Dr. Dubois also noted stiffness in Plaintiff's neck and shoulders and stated that he had a loss of cervical range of motion and flexion in the waist. (Tr. 355). He found that Plaintiff could lift a maximum of ten to twenty pounds, with five pounds frequently, ten pounds occasionally, and twenty pounds very occasionally. He limited Plaintiff to an overhead lift/carry limit of five pounds. (Tr. 355). He found that Plaintiff could stand and walk for ten minutes at one time and for one hour total in a six to eight-hour workday, and could only walk three blocks. (Tr. 355). He found that Plaintiff must be able to sit and stand at will because of pain and weakness and would have difficulty changing from sitting to standing. (Tr. 356). He found that Plaintiff could only sit for seven hours total in a day and should avoid stools or unsupported sitting. (Tr. 356). He found that Plaintiff should do no prolonged or repetitive pushing and pulling and should not push or pull more than twenty-five pounds. (Tr. 356). He stated that pain medication made Plaintiff's pain

tolerable but did not address the underlying issues. He noted that Plaintiff was getting ready to start physical therapy and that lumbar surgery was being proposed. (Tr. 356).

## 2. *Records Related to Mental Impairments*

In April 2008, Plaintiff went to the emergency room with paranoia, confusion, delusions, and bizarre behavior. He was evaluated and admitted. He was diagnosed with bipolar disorder with psychotic features and was placed on various medications. (Tr. 232-33).

Between July 2010 and December 2012, Plaintiff's mental status examinations were largely normal, aside from some notations of anxiety and panic attacks and occasional notations of sleep issues. (Tr. 340-53).

On July 5, 2012, Plaintiff's counselor, Marcella L. Bolzenius, LPC, filled out a questionnaire regarding Plaintiff's mental impairments. Ms. Bolzenius stated that Plaintiff's mental status was "normal aside from mood stability." (Tr. 298). She stated that he was in regular therapeutic attendance and was compliant but continued to struggle. (Tr. 298). She stated that he had limitations in daily activities due to chronic pain; had high stress related to neighborhood and family relationships; had sleep difficulties and difficulty concentrating; and struggled to maintain a stable mood. (Tr. 298). A summary statement from Ms. Bolzenius's office indicates that between May 2011 and July 2012, Plaintiff was seen approximately every two weeks for therapy to deal with high stress, anxiety, and depressive symptoms and that his medications included Zoloft, Valium, and hydrocodone. (Tr. 297).

On October 1, 2012, Plaintiff underwent a psychological evaluation by Thomas J. Spencer, Psy.D. (Tr. 315-18). Dr. Spencer diagnosed major depressive disorder and anxiety

disorder and assigned a Global Assessment of Functioning ("GAF") score of 55 to 60.[1] (Tr. 318). Dr. Spencer opined that Plaintiff retains the ability to remember simple to moderately complex instructions and to engage in simple to moderately complex tasks. He found that Plaintiff demonstrated minimal impairment in his ability to interact socially and in his ability to adapt to change in the workplace. (Tr. 318).

On December 11, 2012, Plaintiff had anxiety, but his mental status examination was otherwise normal. (Tr. 373). On January 29, 2013, Plaintiff's mental status examination was generally normal. (Tr. 371).

## II.    PROCEDURAL BACKGROUND

On June 8, 2012, Plaintiff applied for DIB, alleging that he had been unable to work since April 5, 2008. (Tr. 128-34). In his Disability Report, Plaintiff alleged disability due to degenerative disc disease and degenerative joint disease of the cervical and lumbar spine, obesity, major depressive disorder, and generalized anxiety disorder. (Tr. 164). Plaintiff's application was initially denied. (Tr. 77-81). On December 4, 2012, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ) (Tr. 84-85). After a hearing, the ALJ issued an unfavorable decision on April 23, 2014. (Tr. 12-24). On June 20, 2014, Plaintiff requested review of the ALJ's decision from the Social Security Administration's Appeals Council. (Tr. 5-

---

[1] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

8). On September 9, 2015, the Appeals Council declined to review the case. (Tr. 1-3). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

### III.    STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. § 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or

mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 404.1520(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 404.1520(e). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of

other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff last met the insured status requirements of the Act on December 31, 2012 and did not engage in substantial gainful activity during the period from his alleged onset date of April 4, 2008 through his date last insured. (Tr. 14). The ALJ found that through the date last insured, Plaintiff had the severe impairments of degenerative disc disease and degenerative joint disease of the cervical and lumbar spine, obesity, major depressive disorder, and generalized anxiety disorder, and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 14-15). The ALJ found that Plaintiff had the RFC to perform light work (lifting and carrying 20 pounds occasionally and ten pounds frequently; sitting for at least six hours out of eight; and standing/walking at least six hours out of eight) as defined in 20 CFR § 404.1567(b), except that he can never climb ropes, ladders, or scaffolds and can only occasionally climb ramps, climb stairs, stoop, kneel, or crouch. The ALJ found that Plaintiff should avoid concentrated exposure to extreme cold and unprotected heights; is able to understand, remember, and carry out at least simple instructions and perform non-detailed tasks; should not work in a setting that includes constant or regular contact with the general public; and should not perform work that includes more than infrequent handling of customer complaints. (Tr. 17-18). The ALJ found that through Plaintiffs' date last insured, Plaintiff was unable to perform any of his past relevant work. (Tr. 22). At Step Five, relying on the testimony of a vocational expert, the ALJ found that there were

jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including routing clerk and mail sorter. (Tr. 23).

## V. DISCUSSION

Plaintiff challenges the ALJ's decision on several grounds: (1) that there is no substantial evidence that Plaintiff retains the RFC to perform light work; (2) that the ALJ's decision is contrary to law in that it fails to give sufficient weight to Plaintiff's testimony; (3) that the ALJ's decision is contrary to law in that it fails to give sufficient weight to the opinions of Plaintiff's treating physician; (4) that the ALJ failed to sufficiently explain on the record how he reached his conclusion that Plaintiff had the RFC to perform light work; and (5) that because Plaintiff cannot perform his past relevant work and has no transferrable skills, the Medical-Vocational Guidelines require a finding of disabled.

### A. Standard for Judicial Review

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and

substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. Substantial Evidence Supports the ALJ's Finding that Plaintiff Retains the RFC to Perform Light Work

Plaintiff's first argument is that the ALJ's finding that Plaintiff retains the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), with some additional limitations, is not supported by substantial evidence. A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

Plaintiff focuses his argument on two perceived inconsistencies in the ALJ's RFC finding. First, Plaintiff argues that the ALJ's RFC finding was inconsistent because the ALJ found that Plaintiff would need to be "sitting for at least six hours out of eight" but also found that Plaintiff had the RFC to perform light work, which requires "standing/walking at least six hours out of eight." (Tr. 18). Plaintiff misreads the ALJ's decision. The ALJ did not find that Plaintiff needs to sit for six hours out of eight, but rather that Plaintiff has the capacity to sit for at least six hours of eight. That is not inconsistent with his finding that Plaintiff also has the capacity to stand and/or walk for at least six hours out of eight. The ALJ simply found that

Plaintiff could do a job that required mostly sitting *or* a job that required mostly standing and/or walking. Second, Plaintiff suggests that the ALJ failed to explain how Plaintiff could engage in light work if he could not lift 10 pounds frequently and 20 pounds occasionally. But the ALJ expressly found that Plaintiff *could* lift 10 pounds frequently and 20 pounds occasionally. (Tr. 17). Thus, Plaintiff's argument that there are unresolved inconsistencies in the RFC is without merit.

In addition, the undersigned has reviewed the record as a whole and finds that the ALJ's determination that Plaintiff could perform light work through the date last insured (December 31, 2012), is supported by substantial evidence. Plaintiff's medical records during the relevant time frame indicate that he had neck pain related to cervical spondylosis but that it was generally well-controlled with medication (Tr. 252, 262, 269, 272, 287-95, 302). In addition, Plaintiff's treatment notes during the relevant period consistently indicate that his upper extremity strength was normal. (Tr. 244, 252, 260, 263, 270, 272, 303). In his Function Report, Plaintiff reported that he could lift under 20 pounds. (Tr. 188). Treatment records during the relevant time frame contain no indication that Plaintiff had significant or sustained complaints related to his lumbar spine or to his ability to sit, stand, or walk. In August 2012, an examining physician found Plaintiff had some minor deficits in range of motion in the lumbar spine, but he also stated, "Physically this claimant has little in the way of functional limitations in his activities of daily living." (Tr. 308). Taken together, this evidence provides support for the ALJ's finding that Plaintiff was capable of performing work at the light exertional level. The undersigned further notes that the RFC included significant additional limitations beyond the limitation to light work that accommodated Plaintiff's allegations of pain and difficulty standing and sitting for extended periods, such as the requirement that Plaintiff be able to change from sitting to standing at will.

The undersigned acknowledges that there is evidence that tends to support limitations more significant than those in the RFC; however, that evidence is mostly dated *after* Plaintiff's date last insured and is therefore of less relevance. The relevant question before the ALJ concerned only Plaintiff's medical conditions and limitations prior to the date last insured. *See Turpin v. Colvin*, 750 F.3d 989, 993-94 (8th Cir. 2014) ("If an applicant for disability benefits is not insured for Title II purposes, then we only consider the applicant's medical condition as of his or her date last insured."). MRI findings from February and September 2013 show that plaintiff had degenerative disc disease of the lumbar spine, and Plaintiff's physician opined in November 2013 that Plaintiff had limitations accompanying his lumbar spine impairment, including significant standing, walking, and sitting limitations. (Tr. 355-56, 359, 365). However, as the ALJ reasonably noted, there is no evidence in the medical record of significant or sustained complaints related to a lumbar impairment prior to December 31, 2012—the date last insured. (Tr. 20). Instead, during the relevant time period, Plaintiff's physical complaints related to his cervical spine, not his lumbar spine. (Tr. 288-95, 302-03).[2] Plaintiff's physician also opined in November 2013 that Plaintiff's lifting ability was somewhat more limited than the ALJ found it to be for purposes of the RFC, and that Plaintiff had additional pushing and pulling restrictions. (Tr. 355-56). However, the ALJ reasonably gave less weight to these restrictions than he gave to the treatment notes during the relevant time period showing that Plaintiff's upper

---

[2] Plaintiff argues that a treatment note from January 18, 2012 shows that he reported several months of worsening lower back pain to his physician. However, the referenced note does not indicate that it was concerning Plaintiff's lower back, as opposed to his cervical spine impairment. The note states, "Back pain has progressively been getting worse for 6 mo." (Tr. 259). It is presented under the heading "neck pain" and does not specify that it was a complaint of lower back pain. There is no other indication in the notes from that date that Plaintiff had any lower back pain or lumbar impairment. (Tr. 259-61). Indeed, in the list of Plaintiff's eleven "Chronic Problems" from that day's treatment notes, none are related to the lower back. (Tr. 259). In addition, at Plaintiff's next visit, there is no mention of any lower back pain or any lumbar impairment. (Tr. 262-63).

extremity strength was normal and his cervical pain was well-controlled with medication. (Tr. 20). Assuming, *arguendo*, that Plaintiff had limitations that became disabling in 2013, that does not mean that they were disabling in 2012. *See Turpin,* 750 F.3d at 993-94 (affirming the denial of benefits where there was no evidence that the claimant's impairment was disabling prior to the date last insured).

For all of the above reasons, the undersigned finds that substantial evidence supports the ALJ's finding that Plaintiff was capable of performing work at the light exertional level, with some additional limitations.

### C. The ALJ Properly Evaluated the Credibility of Plaintiff's Testimony

Plaintiff's second argument is that the ALJ gave inadequate weight to his testimony about his impairments. When evaluating the credibility of a plaintiff's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'An ALJ who rejects subjective complaints must make an express credibility determination explaining the reason for discrediting the complaints.'" *Moore*, 572 F.3d at 524 (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)). However, the ALJ need not explicitly discuss each factor. *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)). It is sufficient if the ALJ "acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Id.* The ALJ may not discount allegations of disabling pain solely because they are not fully supported by the

medical evidence, but such allegations may be found not credible if they are inconsistent with the record as a whole. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005).

A review of the record shows that the ALJ made an express credibility determination after adequately considering several of the relevant credibility factors, and that determination is supported by substantial evidence. With regard to daily activities, the ALJ reasonably considered Plaintiff's report to a consultative examiner that he was able to perform all of his daily activities except that he used a riding lawn mower to cut his grass, as well as the consultative examiner's statement that Plaintiff had "little in the way of functional limitations in his activities of daily living." (Tr. 20, 306). Such statements are inconsistent with Plaintiff's testimony that his pain is so severe that it prevents him from sitting or standing for more than 15 minutes at a time and from lifting more than five to seven pounds. With regard to the duration, intensity, and frequency of pain, and the effectiveness of medication, the ALJ reasonably considered numerous medical records from the relevant period showing that Plaintiff did not complain to his doctor of lower back pain and that Plaintiff's cervical pain was controlled with medication. (Tr. 19, 252, 262, 269, 272, 287-95, 302). The ALJ also reasonably considered medical records showing that Plaintiff's upper extremity strength was normal during the relevant time period, which is at odds with the significant lifting limitations Plaintiff now claims to have. (Tr. 19, 244, 252, 260, 263, 270, 272, 303). The ALJ also reasonably considered facts including the absence of evidence of an increase in symptom severity near the alleged onset date and the fact that in the first two years of the alleged disability period, Plaintiff apparently did not require any treatment for his spinal condition. (Tr. 19). With regard to Plaintiff's complaints of anxiety and depression, the ALJ reasonably considered the fact that Plaintiff's mental status examination findings were generally normal aside from occasional findings of a restricted affect, limited

insight, and impaired judgment (Tr. 21-22, 340, 342, 344, 346, 348, 350, 352, 371, 373). He also reasonably considered the findings of the consultative examiner that Plaintiff had no more than a minimal impairment in his ability to interact socially or adapt to changes in the workplace. (Tr. 22, 318). With regard to work history, the ALJ also reasonably considered the fact that Plaintiff did not stop working solely because of his impairments, but rather stopped working almost a year prior to alleged disability onset date in part because he was offered a retirement package that he described as "an early retirement incentive." (Tr. 18-19, 31). *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) ("Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition.").

In his Reply brief, Plaintiff challenges the ALJ's statement that Plaintiff "took advantage of a lucrative retirement package, and only now alleges that he stopped working because of disability." (Tr. 19). Plaintiff points out that he had a long work history and that he retired only after Chrysler eliminated the one job he could do with his functional limitations. (Tr. 41). The undersigned finds no error that undermines the ALJ's credibility analysis as a whole. First, although Plaintiff left his job in part because of his functional limitations, he also left it because a particular job that he *could* perform was being eliminated. Despite the fact that he apparently could do some work at the time the job was eliminated, he did not seek other work from another employer. It was not unreasonable for the ALJ to consider that fact in assessing the credibility of Plaintiff's claim that his impairments render him unable to work. Moreover, Plaintiff's work history was not the only factor the ALJ considered in conducting the credibility analysis.

Plaintiff also argues that the ALJ failed to consider the fact that Plaintiff's treating physician ordered X-ray and MRI studies of Plaintiff's lumbar spine only weeks after his date last insured, and that those studies revealed severe degenerative disc disease and stenosis.

However, the ALJ did not ignore that evidence, but expressly discussed it. (Tr. 20). He considered that evidence along with records dated *before* the date last insured showing that Plaintiff did not seek medical attention for pain or other problems associated with his lumbar spine. *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) ("An ALJ may discount a claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment.").

Plaintiff also suggests that the ALJ did not adequately consider the fact that Plaintiff was consistently prescribed narcotic pain medication, which indicates that he was suffering severe pain. The undersigned agrees that a need for narcotic pain medication is consistent with allegations of significant pain. However, as discussed above, the records indicate that Plaintiff consistently reported that his pain was controlled by the medication. The ALJ reasonably considered this evidence in determining that Plaintiff's pain was not disabling. *See Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) ("'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'" (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)).

For the above reasons, the undersigned finds that the ALJ conducted a proper analysis of the credibility of Plaintiff's testimony. The court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)). Thus, the undersigned finds that this argument does not provide a basis for remand.

### D. The ALJ Properly Evaluated the Opinion of Plaintiff's Treating Physician

Plaintiff's next argument is that the ALJ's decision is contrary to law in that it fails to give sufficient weight to the opinions of Plaintiff's treating physician, Dr. John DuBois.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ may discount a treating physician's opinion if it is inconsistent with the physician's treatment notes or with the record as a whole. *Halverson v. Astrue*, 600 F.3d 922, 929–30 (8th Cir. 2010). Factors the ALJ must consider in assessing a treating physician's opinion include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the evidence provided by the source in support of the opinion, the consistency of the opinion with the record as a whole, the level of specialization of the source, and other relevant factors. 20 C.F.R. §§ 404.1527(c)(2)-(6). "'When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so.'" *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)).

As discussed above, on November 12, 2013, Dr. DuBois opined that due to Plaintiff's significant lumbar and cervical spine problems, he had significant limitations in the ability to sit, stand, lift, push, and pull. (Tr. 355-56). The ALJ discussed Dr. DuBois's opinion and afforded no weight to Dr. Dubois's opinions regarding Plaintiff's ability to stand or walk because those limitations would be related to a lumbar impairment whose effects appeared only after Plaintiff's date last insured. (Tr. 20). That finding is supported by the record. The evidence shows that

during the alleged disability period, Dr. DuBois treated Plaintiff for cervical problems, but not lumbar problems. (Tr. 243, 246, 252, 259, 262, 267, 269, 272, 302). During that period, Plaintiff was found to have a normal gait and full strength in his lower extremities. (Tr. 232, 307, 309). Indeed, as the ALJ also noted, there is no evidence that Plaintiff had any sustained complaints of lumbar problems during the relevant disability period. (Tr. 20). Thus, to the extent that Dr. DuBois's opinion is that Plaintiff had significant impairments related to lumbar problems during the alleged disability period, that opinion is completely unsupported by his own treatment notes and by the record as a whole. Instead, the record indicates that such problems appeared only in 2013. Dr. DuBois's November 2013 opinions regarding Plaintiff's ability to lift, push, and pull are also inconsistent with his treatment notes dated prior to the date last insured, which indicate that Plaintiff's upper extremity strength was normal and that Plaintiff's cervical pain was well-controlled by medication.

Because Dr. DuBois's opinions are inconsistent with his own treatment notes and the record as a whole, it was proper for the ALJ to discount those opinions. *See Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). Although the ALJ did not explicitly discuss every factor of 20 C.F.R. § 404.1527(c) in evaluating the opinions of Plaintiff's treating sources, the ALJ was not required to do so. *See Derda v. Astrue*, No. 4:09CV01847 AGF, 2011 WL 1304909, at *10 (E.D. Mo. Mar. 31, 2011) ("While an ALJ must consider all of the factors set forth in 20 C.F.R. § 404.1527[ ], he need not explicitly address each of the factors.").

### E. The ALJ Adequately Explained How He Reached His RFC Determination

Plaintiff's next argument is that the ALJ failed to sufficiently explain how he reached the conclusion that Plaintiff had the RFC to perform work at the light exertional level with additional limitations. Specifically, Plaintiff argues that to accept the ALJ's finding, one would have to ignore Plaintiff's testimony, the July 2005 MRI study of Plaintiff's cervical spine, and the X-ray and MRI studies of February 2013 revealing degenerative disc disease of the lumbar spine.

Plaintiff's argument is without merit. As discussed above, the ALJ must assess a claimant's RFC based on all of the relevant, credible evidence in the record. *See Tucker*, 363 F.3d at 783. That is what the ALJ did in this case. The ALJ did not "ignore" Plaintiff's testimony or the objective findings cited in Plaintiffs' brief, but considered them as part of his extensive discussion of the medical evidence as a whole, including Plaintiff's treatment notes during the relevant time period and the findings of the treating and consulting sources who offered opinions about his impairments and limitations. (Tr. 17-21). The ALJ explained that he gave great weight to the opinion of Dr. Ishida that Plaintiff had full upper and lower extremity strength and had "little in the way of functional limitations" because he found it consistent with Plaintiff's treatment records. (Tr. 20). In addition, discussed above, the ALJ also analyzed the credibility of Plaintiff's testimony under the required factors. It is clear how the ALJ reached his conclusion that Plaintiff was capable of performing work at the light exertional level.

### F. The Medical-Vocational Guidelines Do Not Require a Finding of Disabled

Plaintiff's final argument is that the Medical-Vocational Guidelines require a finding that Plaintiff was disabled because he is a person closely approaching advanced age, with less than a high school education, with a history of unskilled work and no transferrable skills, who is limited to performing at most sedentary work. This argument is without merit, because it is entirely

dependent on Plaintiff's contention that he is capable only of sedentary work. As discussed extensively above, the ALJ found that Plaintiff was capable of light work, and that conclusion is supported by substantial evidence. Under the Medical-Vocational Guidelines, an individual of Plaintiff's age, education, and vocational background who can perform light work is *not* disabled. *See* 20 C.F.R. Pt. 404, Subpart P, App'x 2 § 202.10. Thus, Plaintiff's argument is without merit.

Because Plaintiff could not perform the full range of light work, but had additional limitations, the ALJ properly consulted a vocational expert to determine whether there were jobs existing in significant numbers in the national economy that Plaintiff could perform. The ALJ described a hypothetical individual with Plaintiff's limitations to the vocational expert, the vocational expert testified that there were jobs such an individual could perform, and the ALJ reasonably relied on that testimony. (Tr. 23, 52-53). Thus, the undersigned finds that the ALJ's finding at Step Five was supported by substantial evidence. *See Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

## VI.   CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of January, 2017.